UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEBORAH CALDWELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:10CV1537 JAR |
| ) | |
| MORPHO DETECTION, INC., et al. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Morpho Detection Inc.'s ("MDI") Motion for Summary Judgment (ECF No. 61). This matter is fully briefed and ready for disposition.

## BACKGROUND

**A. Plaintiff's Claim**

On June 9, 2007, Plaintiff was working at Lambert International Airport as a Transportation Security Officer ("TSO") employed by the Transportation Security Administration ("TSA"). (Statement of Undisputed Material Facts in Support of MDI's Motion for Summary Judgment ("SOF"), ECF No. 63, ¶1). While loading an InVision Computer Tomographic Explosive Detection System ("CTX") 5500 DS Stand Alone Pass Through Explosive Detective System, s/n C490 (the "CTX 5500 C490"), Plaintiff alleges that she was struck by a piece of luggage that fell off the scanner's inclined conveyor. (SOF, ¶1). Plaintiff reported the incident on June 16, 2007. (SOF, ¶2).

On June 9, 2010, Plaintiff brought claims for Strict Liability (Count I), Strict Liability: Failure to Warn (Count II), and Product Liability: Negligence (Count III) against MDI, the entity that designed, manufactured, sold, distributed, and introduced the CTX 5500 DS into the stream of commerce. (SOF, ¶4; ECF No. 5). Plaintiff alleges that the scanner was defectively designed

because (1) the scanner opening was too small, (2) the speed of the entrance conveyor was excessive, and (3) the entrance ramp did not have guard rails. (SOF, ¶4). Plaintiff alleges that MDI failed to warn her of these defects. MDI asserts the government contractor defense as an affirmative defense to all of Plaintiff's claims.

**B.     Brief History of the InVision CTX 5500 DS Luggage Scanner**

In the early 1990s, MDI's predecessors coordinated with the Government for the development of a prototype explosives detection system under Contract No. DTFA03-91-C-00039 ("Contract No. 39"). (SOF, ¶¶9-13). The first scanner certified by the Government, the CTX 5000, was designed to be integrated into existing baggage handling systems and did not include the inclined entrance conveyor. (SOF, ¶¶14, 26; Plaintiff's Statement of Additional Uncontroverted Material Facts ("PSAF"), ECF No. 68, ¶1). The original conveyors to be utilized with the CTX 5000 were to be bought off-the-shelf and did not include an inclined entrance conveyor. (PSAF, ¶¶1, 2). Following the development of the CTX 5000, MDI continued to develop the CTX line of scanners under modifications to Contract 39. MDI eventually developed the second-generation CTX system, the CTX 5000 SP, which included a flat entrance conveyor. (SOF, ¶¶23, 32, 35).

After this change, the Government noted that the flat design of the entrance conveyor made it difficult for TSOs to load luggage into the conveyor. (SOF, ¶35). Accordingly, the Government "requested that MDI develop a prototype solution" to the ergonomic problems experience by the TSOs. (SOF, ¶37). At that time, the Government did not provide any specifications regarding a means of fixing this problem. (PSAF, ¶¶6, 10). An MDI engineer or other design professional was tasked with designing the inclined entrance conveyor. (SOF, ¶ 38; PSAF, ¶10).

In 1996, the CTX 5000 SP was certified by the Government. (SOF, ¶44). The Government certification process evaluated the explosives detection capabilities of the CTX system, not the design of optional parts such as the inclined entrance conveyor. (PSAF, ¶3).

In 1997, the United States purchased approximately 100 CTX 5000 SP explosive detection devices pursuant to contract no. DTFA01-97-C-00021 ("Contract 21"). (SOF, ¶45). Under Contract 21, the FAA specifically requested that the infeed conveyor for the CTX 5000 SP incline from floor to the device. (SOF, ¶47; Exhibit 40).

Between 1994 and 2001, the FAA/TSA procured and installed over 100 CTX explosive detection systems. (SOF, ¶50). Pursuant to Contract DTFA01-02-00023 ("Contract 23"), the United States purchased additional CTX 5500 DS devices in 2001-2002. (SOF, ¶51). Contract 23 incorporated the same specification for an inclined conveyor. (Exhibits 39 and 40). The incline infeed conveyor remained unchanged from the CTX 5000 SP to the CTX 5500 DS. (PSAF, ¶5).

The purchase of the CTX devices, including the CTX 490 at issue, were made under Contract 23. (SOF, ¶52). The Procurement Specifications (MDI's Exhibit 40) pursuant to Contract No. 23 required the CTX systems to satisfy detailed performance, design, and verification requirements. (SOF, ¶53). The explosives detection systems' ("EDS") height, width, length, and weight were all detailed in the Procurement Specifications. (SOF, ¶56). Because the EDS is subject to configuration management, changes are only permitted pursuant to an Engineering Change Order and with express approval by the Government. (SOF, ¶63).

**SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id.

Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of its pleading. Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## DISCUSSION

### I. STANDARD FOR CONTRACTOR DEFENSE

In Boyle v. United Techs. Corp., the United States Supreme Court outlined the necessary elements for application of the government contractor defense:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated -- I. e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create

some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision.

487 U.S. 500, 512-513 (U.S. 1988). "The government contractor defense in Boyle, '[s]tripped to its essentials,' is fundamentally a claim that '[t]he Government made me do it.'" In re Katrina Canal Breaches Litig. Steering Comm., 620 F.3d 455, 465 (5th Cir. 2010)(quoting In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir.1990)). This is an affirmative defense and MDI has the burden of establishing it. Snell v. Bell Helicopter Textron, 107 F.3d 744, 746 (9th Cir. 1997).

The defense is intended to implement and protect the discretionary function exception under the Federal Tort Claims Act, 28 U.S.C. § 2680(a). Snell, 107 F.3d at 746. The Boyle Court wanted to avoid "second guessing" of the judgments of the Armed Forces "through state tort suits against contractors [which] would produce the same effect sought to be avoided by the FTCA exemption." 487 U.S. at 511. "[I]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." Id. at 512.

## II. STRICT LIABILITY: DESIGN DEFECT CLAIM

A. MDI has not demonstrated that the Government approved reasonably precise specifications for the inclined entrance conveyor

Plaintiff alleges a design defect claim against MDI based upon the injury she suffered while loading a CTX. To claim immunity under the government contractor defense, MDI must have implemented a discretionary design decision by the Government.

"The first Boyle step requires that the [G]overnment approved reasonably precise specifications. That entails both the existence of reasonably precise specifications and the approval of those specifications by the [G]overnment." In re Katrina Canal Breaches Litig., 620 F.3d at 461.

"The 'reasonably precise' standard is satisfied as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective." Kerstetter v. Pac. Scientific Co., 210 F.3d 431, 438 (5th Cir. 2000).

MDI makes much of the fact that the Government issued guidelines or Procurement Specifications calling for the conveyor for the scanner. The Procurement Specifications, pursuant to Contract 23, for the CTX 5500 DS, with respect to the inclined entrance conveyor are as follows:

> 3.1.2.4 **Baggage Entrance Conveyor**. The SA EDS shall be designed to feed bags with a powered entrance conveyor for semi-automatic bag loading...
>
> 3.1.2.4.1 **Powered Inclined Conveyor**. The conveyor shall be sloped from floor level (maximum 23 cm from the floor) to the SA EDS entrance.

(PSAF, ¶8).

Based upon these guidelines, the Court finds that MDI is not entitled to the government contractor defense for two main reasons. First, on this record, a trier of fact could find that the Government approved imprecise guidelines as to the infeed conveyor that left the decision-making almost entirely up to the contractor. The guidelines are imprecise and give almost complete discretion to the contractor. "If the [G]overnment approved imprecise or general guidelines, then discretion over important design choices would be left to the government contractor." Trevino v. Gen. Dynamics Corp., 865 F.2d 1474, 1481 (5th Cir. 1989); In re Katrina Canal Breaches Litig., 620 F.3d at 463, n.9. In fact, the only requirement by the Government was that the conveyor be inclined.

In its Motion, MDI argues that "[t]he design and development of a computed tomographic (CTX) scan projection (SP) explosive detection system in response to terrorist threats against the United States is precisely the type of discretionary government function the [government contractor] defense was designed to protect from second guessing through state suits." (Memorandum of Law

in Support of MDI's Motion for Summary Judgment ("Memorandum"), ECF No. 62, p. 12). Throughout the Memorandum, MDI refers to the Government's involvement in the "CTX line of products." See, e.g., Memorandum, p. 12. The Government's certification process, however, related to the explosives detection capabilities of the scanner, not the design of parts such as the inclined entrance conveyor. (PSAF, ¶3). MDI attempts to conflate the Government's approval of the "CTX line of products" with its involvement and approval of the inclined conveyor. MDI argues that "the [G]overnment exercised more than sufficient discretion and control over the design of the CTX system **as a whole**[.]" Memorandum, p. 16 (emphasis added). But, when focusing on just the conveyor, the Government's involvement is insufficient to warrant application of the government contractor defense.

Contract 23, under which the CTX 5500 DS that injured Plaintiff was sold to the Government, references these Procurement Specifications for the inclined entrance conveyor, but does not in any way further describe the design requirements for the inclined entrance conveyor. (PSAF, ¶9). Indeed, an MDI engineer or other design professional was charged with designing the inclined entrance conveyor to correct an ergonomic problem that resulted from the loading of luggage onto a flat conveyor. (PSAF, ¶10). The mere description that the conveyor "must be sloped" is not precise enough and does not demonstrate enough Government involvement for application fo the government contractor defense.

The second reason that MDI is not entitled to the government contractor defense is that the guidelines were issued by the Government only after they had been implemented. The Government only requested a "solution" to the ergonomic issues with the CTX 5000 SP's original flat entrance conveyor design. An MDI engineer came up with the "solution" to that issue and it was approved and incorporated into the design specification after the fact. Importantly, the 2001 Procurement Specifications were drafted to reaffirm the initial design of the system approved following

development pursuant to the Prototype Contract. (PSAF, ¶6). The 2001 Procurement Specifications cited by MDI as Exhibit 40 were produced after the conveyor had already been designed and sold to customers, including the Government. (PSAF, ¶6). In fact, MDI's corporate designee testified that no design changes had to be made to the inclined entrance conveyor as a result of these Procurement Specifications. (PSAF, ¶7). There was not the "continuous back and forth" process present in other cases finding the government contractor defense. Brinson v. Raytheon Co., 571 F.3d 1348, 1355 (11th Cir. 2009). There is no indication that government discretion was utilized in design choice of the conveyor.

For these reasons, the Court concludes that the record does not establish as a matter of law that the Government issued reasonably precise specifications related to the infeed conveyor, the Court denies MDI's Motion for Summary Judgment on Count I on this basis.

    B.    Government's "continued use" of the conveyor does not satisfy the first prong of the Boyle test

Defendant contends that the Government's continued use of the conveyor is sufficient to satisfy the Boyle test. (Memorandum, pp. 16-17). MDI contends that in 2006, one year before the incident (and after the CTX 490 had been in service for four years), the Government approved a design modification which added covers to the base of the scanner and conveyor. (Memorandum, p. 17). MDI contends that "[t]his 2006 modification process, which required the [G]overnment re-examine the specific features at issue in this case, is further evidence of the [G]overnment's approval of the actual design of the CTX 490, which included the design features at issue--the incline in-feed conveyor." (Memorandum, p. 17)

The Court, however, finds that the mere continued use of the conveyor cannot alone satisfy the first prong of the Boyle test. MDI seeks to substitute the requirement for a reasonably precise

specifications with the Government's approval and continued use of the scanner. As noted by the Fifth Circuit,

> We focus our discussion ... on the precision of the specifications, not the process of approval. Although those two issues are intertwined as elements of the first prong of Boyle, they are still two separate conditions that can be analyzed independently. If the specifications are not reasonably precise, it does not matter whether the imprecise specifications were properly approved: The first prong would not be satisfied.

In re Katrina Canal Breaches Litig., 620 F.3d at 463, n.9. As discussed herein, MDI has not demonstrated that the Government issued reasonably precise specifications. Therefore, the Court finds that, even if the Government's specifications were properly approved, then the first prong of the Boyle test would still not be satisfied.

      C.      MDI fails to satisfy the second prong of the Boyle test because it has not demonstrated extensive Government involvement in the "design, review, development and testing" of the incline conveyor

MDI also contends that is satisfies the second prong of the Boyle test with evidence of "[e]xtensive [G]overnment involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production[.]" Kerstetter, 210 F.3d at 435-36; Memorandum, p. 17. MDI contends that the Government has long been involved in the review, evaluation, and testing of the CTX design since 1991. (Memorandum, p. 18). Specific to the conveyor, MDI notes that the inclusion of the conveyor was a specific government request." (Id.). MDI also notes that the Government performed factory acceptance and site acceptance testing on the CTX device before and after its installation.

The Court finds that the record does not support a finding of extensive Government involvement in the "design, review, development and testing" of the incline conveyor. As previously discussed, the Government merely requested that MDI come up with a solution to the ergonomic problem with the baggage handling system. The precise design of the incline conveyor was not directed by the Government. Rather, the design of the conveyor was left completely to the

discretion of MDI engineers and approved after the fact. The Court finds that this case does not have the requisite Government involvement necessary for application of the government contractor defense. Accordingly, MDI fails to satisfy the second prong of the Boyle test, and the Court denies summary judgment on this basis as well.

>   D.   MDI failed to satisfy the third prong of the Boyle test because it did not warn the Government of any dangers related to the conveyor

The third prong of the Boyle test requires the government contractor to warn the Government of all dangers known to the contractor but not to the Government. 487 U.S. at 512. MDI claims that it did not need to notify the Government about the purported dangers of operating the CTX 490 outlined by Plaintiff--size of the entry portal, lack of guardrails and speed of the conveyor--because such dangers were open and obvious to anyone operating the CTX 490 and well-known to the Government. (Memorandum, p. 19). MDI notes that the Government began reviewing the CTX line in 1991. (Id.). Further, the Government maintains a complete baseline version of the 5500 DS at its testing facility. (Id.). The Government also tested the CTX system, including the conveyor, before accepting it. (Id.). Finally, TSA had exclusive control over the daily operation of the CTX system for a period of 5 years before the incident. (Id.).

As with the other prongs, MDI combines the Government's involvement with the CTX system with any involvement it had with the conveyor. The Government delegated the design of the conveyor to MDI and did not have the same degree of oversight and involvement with the conveyor as it did with the scanner as a whole. See Plaintiff's Memorandum in Opposition to MDI's Motion for Summary Judgment, ECF No. 67, p. 25. The Court finds that MDI had greater knowledge of the inclined entrance conveyor and there is no evidence that MDI warned the Government of any danger. MDI fails to satisfy the third prong of the Boyle test, and the Court denies summary judgment on Count I on this basis as well.

## III. FAILURE TO WARN

"[E]stablishing the government contractor defense against the design defect claim does not by itself establish a defense to the plaintiffs' failure to warn claim[.]" Tate v. Boeing Helicopters, 55 F.3d 1150, 1156 (6th Cir. 1995). "When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the [Government] exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the [Government] of the dangers in the equipment's use about which the contractor knew, but the [Government] did not." Id. at 1157.

MDI contends that the TSA/FAA provided warnings and instructions to its employees regarding the use and operation of the CTX 490. (Memorandum, p. 20). In addition, MDI claims that any alleged dangers were open and obvious or were otherwise known to the Government. (Id., pp. 20-21).

Here, there is nothing to suggest that the Government exercised its discretion and approved warnings about the conveyor.[1] Even if Government approval was required, as with the third prong in the Boyle test, the Court finds that MDI did not warn the Government about any dangers of the conveyor's use of which it knew. MDI "has shown neither that '[G]overnment considered the appropriate warnings, if any, that should accompany the product,' Tate v. Boein Helicopters, 55 F.3d 1150, 1156 (6th Cir.1995), nor that it 'approved reasonably precise specifications' constraining

---

[1]MDI claims that "[a]ny warnings provided on a [CTX] devise were also subject to the Government Configuration Management Program and required express approval." (Memorandum, p. 20 (citing SOF, ¶¶62-65). However, as noted by Plaintiff in her Response to MDI's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Plaintiff's Statement of Additional Uncontroverted Material Facts, ECF No. 68, ¶62, MDI's cited materials do not support the proposition that warnings issued with respect to the scanner required Government approval. See Exhibit 45, Configuration Management Plan.

[MDI's] ability to comply with whatever duty to warn it may have had." Snell, 107 F.3d at 749 (citing Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 586 (9th Cir.1996)). The Court finds that MDI is not entitled to the government contractor defense on the failure to warn claim, and denies summary judgment on Count II.

## IV. NEGLIGENCE

Plaintiff alleges that MDI is liable for negligently servicing the CTX 490 because it failed to modify and/or add guard rails, failed to modify the entrance, and failed to add warnings to the machine.

MDI claims that it is entitled to summary judgment on the negligent servicing claim based upon the government contractor defense. MDI claims that under Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329, 1335 (11th Cir. 2003) the government contractor defense applies equally to maintenance contracts. (Memorandum, p. 21). MDI cites to its maintenance contract with the Government that provides that MDI provide "corrective and preventative maintenance." (Exhibit 47).

The Court finds that this is not the type of detailed specification that gives rise to immunity under the government contractor defense. The method of carrying out the maintenance is left entirely to the discretion of MDI. Accordingly, the Court finds that MDI is not entitled to the government contractor defense on Plaintiff's negligence claim, and denies summary judgment on Count III.

Accordingly,

**IT IS HEREBY ORDERED** that MDI's Motion for Summary Judgment [61] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court will hold a telephone conference with the parties on **Thursday, February 14, 2013**, at **10:00 a.m.** to discuss revising the Case Management

Order. The parties should discuss proposed dates prior to the telephone conference. The Court will initiate the telephone conference with the parties.

Dated this 11th day of February, 2013.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE